IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| AB PR QOZB IV PROPERTY, LLC, ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **METROPOLITAN GOVERNMENT OF** ) <br> **NASHVILLE AND DAVIDSON** ) <br> **COUNTY, TENNESSEE,** ) <br> ) <br> **Defendants.** ) | Case No. _____ |

## COMPLAINT

**COMES NOW**, Plaintiff AB PR QOZB IV PROPERTY, LLC, by and through counsel and pursuant to the Federal Rules of Civil Procedure, and files this Complaint against Defendant, The Metropolitan Government of Nashville and Davidson County, Tennessee (hereinafter "**Metro Nashville**"), alleging as follows:

### JURISDICTION

1. Plaintiff AB PR QOZB IV PROPERTY, LLC is a Delaware limited liability company registered and authorized to do business in Tennessee.

2. Defendant Metro Nashville is a consolidated city and county government formed by the City of Nashville and Davidson County, Tennessee, and incorporated pursuant to Tenn. Code Ann. §§ 7-1-101, *et seq*.

3. Pursuant to 28 U.S.C. § 1331, this Court may exercise subject matter jurisdiction over this civil action because it arises under the United States Constitution.

4. Pursuant to 28 U.S.C. § 1332, this Court may exercise subject matter jurisdiction over this civil action because the amount in controversy exceeds $75,000 and involves citizens of different States.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**FACTS**

6. AB PR QOZB IV PROPERTY, LLC is an entity formed by affiliates of Prospect Ridge Advisors, LLC and RangeWater Real Estate, LLC to develop the Project at issue in this case. AB PR QOZB IV PROPERTY, LLC, and its predecessors, members, and agents acting on its behalf are referred to as "**AB PR QOZB IV**" herein.

7. Plaintiff is the owner of real property in Metro Nashville identified as:

> 201 COWAN STREET, NASHVILLE, TN 37213
> PARCEL ID 082-140-043.00
> LOTS 16 THRU 21 PT LOTS 15 & 22 WETMORE & PT CLSD ALLEY

(the "**Property**"). The Property encompasses former addresses 51 Oldham Street, 212 North 1st Street, 226 North 1st Street, and 0 North 1st Street, Nashville, TN 37213, and former parcel numbers 082-140-079.00, 082-100-034.00, 082-100-035.00.

8. AB PR QOZB IV purchased the Property on or about September 13, 2021, for $12,500,000, with the intention to develop the Property with a multi-story residential structure (comprised of more than 350 units) and a parking facility pursuant to submitted plans (the "**Project**").

9. Prior to obtaining a construction loan, a guaranteed maximum price construction contact, and acquiring the Property, AB PR QOZB IV and its predecessors spent more than twelve (12) months and significant costs identifying the Property, negotiating and executing a purchase contract, completing due diligence, confirming entitlements, submitting preliminary and more advanced permit applications for the Project to Meto Nashville, advancing architectural and engineering drawings, and raising equity capital. Following execution of the construction loan, the guaranteed maximum price construction contract, and land closing, the general contractor of AB

PR QOZB IV negotiated and entered into subcontractor agreements pursuant to the guaranteed maximum price contract.

10. The Property is in a "Qualified Opportunity Zone." Qualified Opportunity Zones were created under the Tax Cuts and Jobs Act of 2017 (Public Law No. 115-97), and guidance in respect of the Qualified Opportunity Zone regime was promulgated pursuant to Sections 1400Z-1 and 1400Z-2 of the Internal Revenue Code of 1986, as amended, and Treasury Regulations issued thereunder (the "**QOF Rules**"). The QOF Rules permit the fifty (50) United States, the District of Columbia, and certain United States possessions, to designate Qualified Opportunity Zones in economically distressed communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

11. Prior to closing on the Property, AB PR QOZB IV (through its affiliated entities, AB PR QOF IV L.P. and AB PR Parallel QOF IV L.P.) raised capital from investors pursuant to the requirements of the QOF Rules. That is, AB PR QOZB IV's investors invested capital gains funds (earned from prior investments) in Plaintiff and its related entities pursuant to the applicable QOF Rules.

12. To move forward with the Project, AB PR QOZB IV submitted the following requests for permits together with payment of required filing fees:

    a. On or around February 10, 2021, AB PR QOZB IV submitted a formal request to Metro Nashville for a letter of water and sewer availability. Metro Nashville completed and approved the water/sewer availability review.

    b. On or around March 30, 2021, AB PR QOZB IV applied for a zoning variance from the Metro Nashville Board of Zoning Appeals (the "**BZA**") due to the Property's unique elevation issues. The BZA held a public hearing on May 20,

2021, determined that AB PR QOZB IV satisfied all the requirements for a variance under Metro Code § 17.40.370, and unanimously approved the requested variance without conditions.

c. On or around April 12, 2021, AB PR QOZB IV applied for a grading permit. On May 14, 2021, Metro Nashville reviewed the grading permit and returned it to AB PR QOZB IV with comments. AB PR QOZB IV then revised its grading permit application, incurring additional civil engineering fees, to conform to Metro Nashville's requests. This review, return, and revision process occurred three (3) more times before Metro Nashville approved a grading plan on September 13, 2021.

d. In June 2021, AB PR QOZB IV participated in various discussions with Metro Nashville about the site layout plan, including streetscape design around the Project, required right-of-way dedication, zoning, and Project timeline.

e. From June through September 2021, AB PR QOZB IV submitted additional permit applications for the Project including, applications for a master site plan permit, building shell permit, eight (8) interior finish permits, and a building shell permit for the garage portion of the Project.

f. On or around June 16, 2021, Metro Nashville received AB PR QOZB IV's master site building plans.

g. On or around July 6, 2021, Metro Nashville reviewed AB PR QOZB IV's building shell permit application for the Project and provided comments.

h.  On or around July 12, 2021, Metro Nashville completed review of AB PR QOZB IV's application for eight (8) interior finish permits and provided written guidance to AB PR QOZB IV for issuance of these permits.

i.  On or around September 13, 2021, Metro Nashville completed review of AB PR QOZB IV's application for a building shell permit for the garage portion of the Project and provided written comments to AB PR QOZB IV on how to finalize Metro Nashville's approval of both building shell permit applications.

13. Metro Nashville did not raise any concerns about AB PR QOZB IV's development of the Property or the feasibility of the Project while AB PR QOZB IV was engaged in the permitting process described above.

14. In reliance on Metro Nashville's review and imminently anticipated approval of the foregoing plans, on or around September 13, 2021, AB PR QOZB IV purchased the Property with the intent to develop the Project on the Property as soon as possible.

15. Also in reliance on Metro Nashville's continued review of and written forward guidance on continued permit applications and plan approvals, on or around September 13, 2021, AB PR QOZB IV closed on a $59,600,000 construction loan (the "**Construction Loan**") to finance development of the Project. To comply with the Construction Loan and avoid default, AB PR QOZB IV was required to commence construction of the Project within sixty (60) days after closing the Construction Loan.

16. AB PR QOZB IV also entered into a guaranteed maximum price construction contract (the "**GMP Construction Contract**") in September 2021. The GMP Construction Contract set a guaranteed maximum price for construction of the Project, beyond which the contractor would absorb cost overruns. The GMP Construction Contract also required AB PR

QOZB IV to meet development milestones on the Project to preserve the cost certainty benefits of the contract.

17. As anticipated, Metro Nashville approved AB PR QOZB IV's grading plans on September 13, 2021, and notified AB PR QOZB IV of the approval on September 14, 2021.

18. On September 21, 2021, following review of AB PR QOZB IV's grading permit application, Metro Nashville held a preconstruction meeting which typically brings together key stakeholders to establish authority, clarify responsibilities, identify potential issues, and plan for a successful project. During this meeting, Metro Nashville did not communicate any material concerns about the Project or about the issuance of permits for the Project in the ordinary course of business. That same day, Metro Nashville approved a tentative grading permit for the Project.

19. On or around September 24, 2021, Metro Nashville approved AB PR QOZB IV's demolition permit. AB PR QOZB IV completed demolition of the buildings on the Property by the end of October 2021.

20. On or around September 28, 2021, moving forward with the Project and in reliance on Metro Nashville's approval of the Project's grading plans, attendance at the preconstruction meeting, and issuance of the demolition permit, AB PR QOZB IV paid approximately $294,000 in sewer capacity fees to Metro Nashville.

21. In October 2021, Metro Nashville refused to issue the grading permit tied to the plans it had approved just weeks before. In explanation of its decision, Metro Nashville told AB PR QOZB IV that: "Metro is presently engaged in a planning process to determine public infrastructure needs in the area where your development is proposed. We may be engaging with you in the near term for possible acquisition for those purposes. We look forward to continued coordination with you."

22. Through AB PR QOZB IV's own investigation of Metro Nashville's statement, AB PR QOZB IV learned, for the first time, of Metro Nashville's hypothetical plan to build a new road (the "**Spine Road**") through AB PR QOZB IV's site, effectively bisecting the Property.

23. Following the news of Metro Nashville's potential Spine Road plan, beginning in October 2021, AB PR QOZB IV engaged Metro Nashville, and participated in multiple meetings with city officials at all levels, including city engineers, on the potential Spine Road location and impact on the Property. During these discussions, Metro Nashville advised that it was working to determine the location of the Spine Road and intended to have a final location within weeks so that AB PR QOZB IV could determine whether the Spine Road and Metro Nashville's hypothetical development of its Imagine East Bank Vision Plan (the "**Vision Plan**") would meaningfully impact the Property and Project.

24. Metro Nashville finally issued AB PR QOZB IV's grading permit on November 4, 2021, more than a month after approving the associated grading plans. Metro Nashville did not give AB PR QOZB IV any additional guidance about the status of the Spine Road or Vision Plan at that time.

25. Around November 23, 2021, without prior notice to AB PR QOZB IV and after issuing the AB PR QOZB IV grading permit, Metro Nashville placed a permit lock (the "**Permit Lock**") on AB PR QOZB IV's master permit, which restricted all Metro Nashville departments' abilities to issue or approve the master permit or any other permits for the Project. The Permit Lock effectively barred (and continues to bar) AB PR QOZB IV from proceeding with the Project.

26. Metro Nashville made the "business decision" to impose and enforce the Permit Lock to preserve the East Bank area as a blank canvas for the proposed (but merely conceptual)

7

Case 3:24-cv-00280     Document 1     Filed 03/08/24     Page 7 of 15 PageID #: 9

Vision Plan, no matter the economic consequence to AB PR QOZB IV, its investors, or other neighboring property owners.

27. Assuming that Metro Nashville was operating in good faith and would quickly allow AB PR QOZB IV to move forward with developing the Project, AB PR QOZB IV continued discussions about the status of the Spine Road and the Vision Plan with Metro Nashville through the end of 2021 and into 2022. At no point during these conversations did Metro Nashville indicate that AB PR QOZB IV would not be permitted to proceed with the Project. During this time, Metro Nashville showed a willingness to work with AB PR QOZB IV by having its engineers discuss alternative road plans for the Spine Road location with AB PR QOZB IV's engineers, to determine if an ultimate placement and design (including elevations) for the Spine Road plan could substantially avoid the Project's construction footprint.

28. As AB PR QOZB IV worked to obtain information from Metro Nashville about the Vision Plan and Spine Road location and their effects on the Project, AB PR QOZB IV was faced with material timing-based performance obligations under both the GMP Construction Contract and the Construction Loan. On or around November 24, 2021, due to Metro Nashville's actions and the resulting impossibility of commencing Project construction, AB PR QOZB IV was forced to suspend the GMP Construction Contract, which left AB PR QOZB IV potentially liable for significant termination fees owed to the general contractor, and terminated the Project cost protection contract provisions. Similarly, in November 2021, AB PR QOZB IV was forced to terminate the Construction Loan due to failure to commence construction of the Project in a timely manner, termination of the GMP Construction Contract, and other delay causes, resulting in further economic damages.

29. Following the Permit Lock, AB PR QOZB IV repeatedly asked Metro Nashville when the Permit Lock would be released so that AB PR QOZB IV could make informed business decisions and mitigate its damages, which rose daily. However, then and now, due to the nascent stage of Metro Nashville's Vision Plan, Metro Nashville was (and remains) unable to provide any material guidance on a Permit Lock release date. Instead, Metro Nashville has continuously imposed new and different conditions for its release of the Permit Lock, including, but not limited to, Metro Nashville's establishing a final (or near final) Spine Road location with requisite engineering and construction plans (including road elevations), acquisition of state, federal, and local funding for land acquisition and construction costs, and final Titans stadium plans.

30. Per Metro Code § 17.40.250, without a formal moratorium, Metro Nashville was required to allow AB PR QOZB IV to obtain all permits necessary to satisfy its BZA requirements on or before May 21, 2023.

31. Due to the investment opportunity this Project provided and the immense time and material costs that were funneled into developing the Project, and in reliance on its discussions with Metro Nashville, AB PR QOZB IV had no practical business path but to wait for Metro Nashville to lift the Permit Lock.

32. To date, Metro Nashville has not lifted the Permit Lock and development of the Project remains impossible.

33. Moreover, the QOF Rules require that investments in Qualified Opportunity Zones deploy working capital assets (the invested funds) to commence construction and complete the Project within a limited amount of time to qualify for tax benefits under the QOF Rules. Metro Nashville's imposition of the indefinite Permit Lock on the Project prevented AB PR QOZB IV from being able to determine if it could meet the timelines required by the QOF Rules, resulting

in the loss of certainty to AB PR QOZB IV's investors of material tax benefits, exposure to additional costs and penalties, and AB PR QOF IV L.P. and AB PR Parallel QOF IV L.P. decertifying themselves as "Qualified Opportunity Funds" within the meaning of Treasury Regulations Section 1.1400Z2(d)-1(a)(3).

34. Metro Nashville has made no effort to minimize the damages it is causing AB PR QOZB IV. The self-serving Permit Lock, which benefits Metro Nashville alone, evidences Metro Nashville's indifferent attitude and disrespect of owner property rights.

35. AB PR QOZB IV's grading permit expired on January 23, 2024, because of Metro Nashville's Permit Lock. The grading permit required that grading must be completed within a year, but AB PR QOZB IV was unable to begin grading work without assurances from Metro Nashville that it would lift the Permit Lock and allow AB PR QOZB IV to develop the Project.

36. As a direct consequence of Metro Nashville's indefinite Permit Lock, the Project as designed is no longer feasible. Plaintiff has suffered, and continues to suffer, substantial economic harm.

37. Metro Nashville has an obligation to issue proper and timely permits and, by not doing so in this instance, Metro Nashville abused (and continues to abuse) its power by encroaching upon private interests without a reasonable public purpose. Metro Nashville's illegal and indefinite de facto moratorium on the issuance of permits constitutes an illegal regulatory taking of Plaintiff's Property without its consent, and without due process of law or compensation, in violation of the Fifth Amendment of the United States Constitution and Article I, § 21 of the Tennessee Constitution.

38. Metro Nashville's absolute and ceaseless control over Plaintiff's Property, via the permit system, constitutes a "per se" taking because it has wholly divested Plaintiff of its rights in the Property.

39. Metro Nashville's intentional deprivation and interference of Plaintiff's property rights amounts to a trespass.

40. Metro Nashville is exceeding its authority and acting in a legislative capacity by implementing its own permit moratorium, without due process.

41. Plaintiff demands a trial by jury on all matters.

## COUNT I
## DECLARATORY JUDGMENT
*TENN. CODE ANN. § 29-14-103*

42. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-41 as if fully set forth herein and further states:

43. There is a genuine and substantial controversy that exists between the parties with respect to Metro Nashville's refusal to issue permits.

44. Plaintiff seeks a determination from this Court as to whether (1) Plaintiff has vested rights in the Property and (2) whether Metro Nashville's indefinite Permit Lock is legal.

45. In good faith, Plaintiff reasonably relied on Metro Nashville's issuance of permits and approvals to purchase the Property, incur substantial pre-development costs, close on the Construction Loan, and enter into the GMP Construction Contract for the development of a large residential structure and parking facility on the Property.

46. Plaintiff expended substantial financial resources to commence sitework immediately after demolition.

47. Metro Nashville's Permit Lock has effectively prevented Plaintiff from developing the Property.

48. By ignoring Metro Code § 17.40.250 and indefinitely extending the Permit Lock, Metro Nashville has exceeded its authority by expanding its powers to interfere with private rights.

### COUNT II
### TRESPASS
*TENN. CODE ANN. § 29-34-208*

49. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-48 as if fully set forth herein and further states:

50. Metro Nashville has illegally invaded Plaintiff's Property by knowingly encroaching on Plaintiff's property interests for self-serving purposes.

51. Plaintiff has not authorized Metro Nashville to invade its Property. Although Plaintiff recognizes that Metro Nashville has the authority to *temporarily* invade the Property by instituting a *temporary* permit lock, pursuant to Metro Code § 17.40.250, Metro Nashville does not have the power to expand the Permit Lock for an *indefinite* invasion.

52. Via the Permit Lock, Metro Nashville has granted itself complete control over the property and by doing so, has deprived Plaintiff of its right to use its Property.

53. Metro Nashville's illegal and ceaseless occupancy of the Property constitutes a trespass of Plaintiff's Property and rights therein.

54. Metro Nashville's interference with Plaintiff's property rights has caused substantial damages.

### COUNT III
### "PER SE" TAKING
*U.S. CONST. amend V; Tenn. Const. art. I, § 21*

55. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-54 as if fully set forth herein and further states:

56. Plaintiff has a valuable and vested interest in the Property.

57. However, by *sua sponte* declaring that it has the authority to indefinitely extend the Permit Lock, Metro Nashville has excluded Plaintiff from all current and future use and occupancy of its Property. This is a direct interference with Plaintiff's property rights.

58. Plaintiff is unable to possess its Property, as it is occupied in its entirety by Metro Nashville for the future development of the Vision Plan.

59. The indefinite and continuing duration of the Permit Lock has directly interfered with Plaintiff's distinct investment backed expectations; Plaintiff is not simply experiencing a diminution in value of its Property/Project, the Permit Lock has rendered the Property less valuable and the Project no longer feasible. Metro Nashville's actions, causing extreme delays during a time of drastic economic changes, rendered the Project no longer feasible, causing Plaintiff permanent and substantial economic damages.

60. Since Metro Nashville has taken the Property and all rights related thereto, Plaintiff is entitled to just compensation.

## COUNT IV
## REGULATORY TAKING
*U.S. CONST. amend V.; Tenn. Const. art. I, § 21*

61. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-60 as if fully set forth herein and further states:

62. Metro Nashville's Permit Lock is a regulation that has denied Plaintiff all economically beneficial or productive use of the Property.

63. Metro Nashville's intentional frustration of the Project's commencement of construction on the Property to enable potential development of the Vision Plan does not substantially advance legitimate governmental interests. Not only is the Vision Plan a mere vision at this point, but also, alternative viable options exist for the development of the East Bank that would avoid interference with Plaintiff's rights.

64. Due to the substantial damages that Plaintiff has incurred, even if Metro Nashville were to lift the Permit Lock now, Plaintiff would be unable to commence the Project as planned and may not be able to develop any alternative project. Since Metro Nashville's Permit Lock, Plaintiff has suffered the termination of both the GMP Construction Contract and the Construction Loan at material costs to Plaintiff, which together with material changes in the real estate development economic environment (construction costs, interest rates, and other factors), make the Project development difficult, if not currently impossible to develop.

65. Additionally, the Permit Lock constitutes an illegal encumbrance on the Property as well as a material diminution of the Property's value.

66. Metro Nashville has chosen to not reduce Plaintiff's damages.

67. Metro Nashville, via its Permit Lock, has directly caused extraordinary damages to Plaintiff; Plaintiff is entitled to just compensation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, AB PR QOZB IV PROPERTY, LLC, respectfully prays the following:

A. Process issue and Metro Nashville be required to answer this Complaint within the time prescribed by law;

B. This Court find that a genuine controversy exists between the parties with respect to the enforcement and interpretation of Tennessee statutory law governing the authority of Metro Nashville to enforce an indefinite permit lock when an approved variance is pending;

C. This Court issue a declaratory judgment, pursuant to Tenn. Code Ann. § 29-14-103, that:

   a. Plaintiff has a vested right in the Property;

b. Metro Nashville's indefinite refusal to issue permits is outside Metro Nashville's statutory power;

D. Empanel a jury of twelve (12) persons to try the issues of full compensation for the taking of Plaintiff's property according to the Complaint and the United States Constitution, and render its verdict of full compensation together with punitive damages, statutory interest, attorneys' fees, experts' fees, and costs for the prosecution of this matter according to case and statutory law;

E. This Court find that Metro Nashville willfully and knowingly violated Plaintiff's rights provided by the Fifth Amendment of the United States Constitution and Tennessee Constitution article I, section 21;

F. Costs of this cause be taxed to Metro Nashville; and

Grant such other and further relief to the Plaintiff as the Court deems necessary and appropriate in this cause.

Dated: March 8, 2024.

Respectfully submitted,

*/s/ Kate Skagerberg*
Kate Skagerberg, BPR No. 040096
Mackenzie Keffalos, BPR No. 038355
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
1222 Demonbreun Street, Ste 1700
Nashville, TN 37203
(615) 664-5333
Kate.Skagerberg@nelsonmullins.com
Mackenzie.Keffalos@nelsonmullins.com

*Attorneys for Plaintiff*
*AB PR QOZB IV PROPERTY, LLC*