**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **AB PR QOZB IV PROPERTY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 3:24-cv-00280** |
| | ) | |
| **v.** | ) | **Judge Richardson** |
| | ) | **Magistrate Judge Evans** |
| **METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,** | ) | |
| | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

## SECOND AMENDED COMPLAINT

**COMES NOW**, Plaintiff AB PR QOZB IV PROPERTY, LLC ("Plaintiff" or "AB PR QOZB IV"), by and through counsel and pursuant to the Federal Rules of Civil Procedure, and files this Second Amended Complaint against Defendant, The Metropolitan Government of Nashville and Davidson County, Tennessee (hereinafter "**Metro Nashville**"). This Second Amended Complaint is filed pursuant to leave of Court granted on [DATE]. Plaintiff alleges as follows:

### JURISDICTION

1. Plaintiff AB PR QOZB IV PROPERTY, LLC is a Delaware limited liability company registered and authorized to do business in Tennessee.

2. Defendant Metro Nashville is a consolidated city and county government formed by the City of Nashville and Davidson County, Tennessee, and incorporated pursuant to Tenn. Code Ann. §§ 7-1-101, *et seq*.

3. Pursuant to 28 U.S.C. § 1331, this Court may exercise subject matter jurisdiction over this civil action because it arises under the United States Constitution.

4. Pursuant to 28 U.S.C. § 1332, this Court may exercise subject matter jurisdiction over this civil action because the amount in controversy exceeds $75,000 and involves citizens of different States.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

**FACTS**

6. AB PR QOZB IV PROPERTY, LLC is an entity formed by affiliates of Prospect Ridge Advisors, LLC and RangeWater Real Estate, LLC to develop the Project at issue in this case. AB PR QOZB IV PROPERTY, LLC, and its predecessors, members, and agents acting on its behalf are referred to as "**AB PR QOZB IV**" or "**Plaintiff**" herein.

7. Plaintiff is the owner of real property in Metro Nashville identified as:

201 COWAN STREET, NASHVILLE, TN 37213
PARCEL ID 082-140-043.00
LOTS 16 THRU 21 PT LOTS 15 & 22 WETMORE & PT CLSD ALLEY

(the "**Property**"). The Property encompasses former addresses 51 Oldham Street, 212 North 1st Street, 226 North 1st Street, and 0 North 1st Street, Nashville, TN 37213, and former parcel numbers 082-140-079.00, 082-100-034.00, 082-100-035.00.

8. Plaintiff purchased the Property on or about September 15, 2021, for $12,500,000, with the intention to develop the Property with a multi-story residential structure (comprised of more than 350 units) and a parking facility pursuant to submitted plans (the "**Project**").

9. Prior to obtaining a construction loan, a guaranteed maximum price construction contract, and acquiring the Property, Plaintiff and its predecessors spent more than twelve (12) months and significant costs identifying the Property, negotiating and executing a purchase contract, completing due diligence, confirming entitlements, submitting preliminary and more advanced permit applications for the Project to Metro Nashville, advancing architectural and

engineering drawings, and raising equity capital. Following execution of the construction loan, the guaranteed maximum price construction contract, and land closing, the general contractor of Plaintiff negotiated and entered into subcontractor agreements pursuant to the guaranteed maximum price contract.

10. The Property is in a "Qualified Opportunity Zone." Qualified Opportunity Zones were created under the Tax Cuts and Jobs Act of 2017 (Public Law No. 115-97), and guidance in respect of the Qualified Opportunity Zone regime was promulgated pursuant to Sections 1400Z-1 and 1400Z-2 of the Internal Revenue Code of 1986, as amended, and Treasury Regulations issued thereunder (the "**QOF Rules**"). The QOF Rules permit the fifty (50) United States, the District of Columbia, and certain United States possessions, to designate Qualified Opportunity Zones in economically distressed communities where new investments, under certain conditions, may be eligible for preferential tax treatment.

11. Prior to closing on the Property, Plaintiff (through its affiliated entities, AB PR QOF IV L.P. and AB PR Parallel QOF IV L.P.) raised capital from investors pursuant to the requirements of the QOF Rules. That is, Plaintiff's investors invested capital gains funds (earned from prior investments) in Plaintiff and its related entities pursuant to the applicable QOF Rules.

12. To move forward with the Project, Plaintiff submitted the following requests for permits together with payment of required filing fees:

a. On or around February 10, 2021, Plaintiff submitted a formal request to Metro Nashville for a letter of water and sewer availability. Metro Nashville completed and approved the water/sewer availability review.

b. On or around March 30, 2021, Plaintiff applied for a zoning variance from the Metro Nashville Board of Zoning Appeals (the "**BZA**") due to the Property's

unique elevation issues. The BZA held a public hearing on May 20, 2021, determined that Plaintiff satisfied all the requirements for a variance under Metro Code § 17.40.370, and unanimously approved the requested variance (the "**Variance**") without conditions. The BZA approval Order is attached as **Exhibit A**.

c. On or around April 12, 2021, Plaintiff applied for a grading permit. On May 14, 2021, Metro Nashville reviewed the grading permit and returned it to Plaintiff with comments. Plaintiff then revised its grading permit application, incurring additional civil engineering fees, to conform to Metro Nashville's requests. This review, return, and revision process occurred three (3) more times before Metro Nashville approved a grading plan on September 13, 2021.

d. In June 2021, Plaintiff participated in various discussions with Metro Nashville about the site layout plan, including streetscape design around the Project, required right-of-way dedication, zoning, and Project timeline.

e. From June through September 2021, Plaintiff submitted additional permit applications for the Project including, applications for a master site plan permit, building shell permit, eight (8) interior finish permits, and a building shell permit for the garage portion of the Project.

f. On or around June 16, 2021, Metro Nashville received Plaintiff 's master site building plans.

g. On or around July 6, 2021, Metro Nashville reviewed Plaintiff 's building shell permit application for the Project and provided comments.

h. On or around July 12, 2021, Metro Nashville completed review of Plaintiff 's application for eight (8) interior finish permits and provided written guidance to Plaintiff for issuance of these permits.

i. On or around September 13, 2021, Metro Nashville completed review of Plaintiff 's application for a building shell permit for the garage portion of the Project and provided written comments to Plaintiff on how to finalize Metro Nashville's approval of both building shell permit applications.

13. Metro Nashville did not raise any concerns about Plaintiff 's development of the Property or the feasibility of the Project while Plaintiff was engaged in the permitting process described above.

14. In reliance on Metro Nashville's review and imminently anticipated approval of the foregoing plans, on or around September 13, 2021, Plaintiff purchased the Property with the intent to develop the Project on the Property as soon as possible.

15. Also in reliance on Metro Nashville's continued review of and written forward guidance on continued permit applications and plan approvals, on or around September 13, 2021, Plaintiff closed on a $59,600,000 construction loan (the "**Construction Loan**") to finance development of the Project. To comply with the Construction Loan and avoid default, Plaintiff was required to commence construction of the Project within sixty (60) days after closing the Construction Loan.

16. Plaintiff also entered into a guaranteed maximum price construction contract (the "**GMP Construction Contract**") in September 2021. The GMP Construction Contract set a guaranteed maximum price for construction of the Project, beyond which the contractor would

absorb cost overruns. The GMP Construction Contract also required Plaintiff to meet development milestones on the Project to preserve the cost certainty benefits of the contract.

17. As anticipated, Metro Nashville approved Plaintiff's grading plans on September 13, 2021, and notified Plaintiff of the approval on September 14, 2021.

18. On September 21, 2021, following review of Plaintiff's grading permit application, Metro Nashville held a preconstruction meeting which typically brings together key stakeholders to establish authority, clarify responsibilities, identify potential issues, and plan for a successful project. During this meeting, Metro Nashville did not communicate any material concerns about the Project or about the issuance of permits for the Project in the ordinary course of business. That same day, Metro Nashville approved a tentative grading permit for the Project.

19. On or around September 24, 2021, Metro Nashville approved Plaintiff's demolition permit. Plaintiff completed demolition of the buildings on the Property by the end of October 2021.

20. On or around September 28, 2021, moving forward with the Project and in reliance on Metro Nashville's approval of the Project's grading plans, attendance at the preconstruction meeting, and issuance of the demolition permit, Plaintiff paid approximately $294,000 in sewer capacity fees to Metro Nashville.

21. In October 2021, Metro Nashville refused to issue the grading permit tied to the plans it had approved just weeks before. In explanation of its decision, Metro Nashville told Plaintiff that: "Metro is presently engaged in a planning process to determine public infrastructure needs in the area where your development is proposed. We may be engaging with you in the near term for possible acquisition for those purposes. We look forward to continued coordination with you."

22. Through Plaintiff's own investigation of Metro Nashville's statement, Plaintiff learned, for the first time, of Metro Nashville's hypothetical plan to build a new road (the "**Spine Road**") through Plaintiff's site, effectively bisecting the Property.

23. Following the news of Metro Nashville's potential Spine Road plan, beginning in October 2021, Plaintiff engaged Metro Nashville, and participated in multiple meetings with city officials at all levels, including city engineers, on the potential Spine Road location and impact on the Property. During these discussions, Metro Nashville advised that it was working to determine the location of the Spine Road and intended to have a final location within weeks so that Plaintiff could determine whether the Spine Road and Metro Nashville's hypothetical development of its Imagine East Bank Vision Plan (the "**Vision Plan**") would meaningfully impact the Property and Project.

24. Metro Nashville finally issued Plaintiff's grading permit on November 4, 2021, more than a month after approving the associated grading plans. Metro Nashville did not give Plaintiff any additional guidance about the status of the Spine Road or Vision Plan at that time.

25. Around November 23, 2021, without prior notice to Plaintiff and after issuing the Plaintiff grading permit, Metro Nashville placed a permit lock (the "**Permit Lock**") on Plaintiff's master permit, which restricted all Metro Nashville departments' abilities to issue or approve the master permit or any other permits for the Project. The Permit Lock effectively barred Plaintiff from proceeding with the Project on an indefinite basis.

26. Metro Nashville made the "business decision" to impose and enforce the Permit Lock to preserve the East Bank area as a blank canvas for the proposed (but merely conceptual) Vision Plan, no matter the economic consequence to Plaintiff, its investors, or other neighboring property owners.

27. Assuming that Metro Nashville was operating in good faith and would quickly allow Plaintiff to move forward with developing the Project, Plaintiff continued discussions about the status of the Spine Road and the Vision Plan with Metro Nashville through the end of 2021 and into 2022. At no point during these conversations did Metro Nashville indicate that Plaintiff would not be permitted to proceed with the Project. During this time, Metro Nashville showed a willingness to work with Plaintiff by having its engineers discuss alternative road plans for the Spine Road location with Plaintiff's engineers, to determine if an ultimate placement and design (including elevations) for the Spine Road plan could substantially avoid the Project's construction footprint.

28. As Plaintiff worked to obtain information from Metro Nashville about the Vision Plan and Spine Road location and their effects on the Project, Plaintiff was faced with material timing-based performance obligations under both the GMP Construction Contract and the Construction Loan. On or around November 24, 2021, due to Metro Nashville's actions and the resulting impossibility of commencing Project construction, Plaintiff was forced to suspend the GMP Construction Contract, which left Plaintiff potentially liable for significant termination fees owed to the general contractor, and terminated the Project cost protection contract provisions. Similarly, in November 2021, Plaintiff was forced to terminate the Construction Loan due to failure to commence construction of the Project in a timely manner, termination of the GMP Construction Contract, and other delay causes, resulting in further economic damages.

29. In January and February 2022, Metro Nashville, through Metro Water Services, adjusted the Project's permit expiration dates in its system to February 25, 2023, and continued to guarantee Plaintiff's existing water and sewer capacity and fee schedule notwithstanding the delay in the Project. Plaintiff relied on Metro Nashville's continued cooperation and assurances, and

Plaintiff had already paid substantial capacity fees, including approximately $294,000 in sewer capacity fees. A copy of the correspondence is attached as **Exhibit B**.

30. Following the Permit Lock, Plaintiff repeatedly asked Metro Nashville when the Permit Lock would be released so that Plaintiff could make informed business decisions and mitigate its damages, which rose daily. However, due to the nascent stage of Metro Nashville's Vision Plan, Metro Nashville was unable to provide any material guidance on a Permit Lock release date. Instead, Metro Nashville continuously imposed new and different conditions for its release of the Permit Lock, including, but not limited to, Metro Nashville's establishing a final (or near final) Spine Road location with requisite engineering and construction plans (including road elevations), acquisition of state, federal, and local funding for land acquisition and construction costs, and final Titans stadium plans.

31. Pursuant to Metro Code § 17.40.250, the Variance, which was approved by the BZA on or about May 20, 2021, would lapse if Plaintiff did not obtain the required permits from Metro Nashville to construct the Project within two (2) years. Facing this deadline, and unable to obtain permits due to the Permit Lock, Plaintiff asked the Metro Nashville Department of Law to facilitate an extension of the variance lapse date.

32. On or about March 28, 2023, in written correspondence, Metro Nashville's Zoning Administrator acknowledged that Metro Nashville itself was the cause of the delay in commencing the Project and agreed to extend the Variance's two-year permitting deadline, stating: "Seeing as we (Metro) are the reasoning for the delay, I will pause the time during the time that Metro held up the permits and not count that time against the 2 year deadline. This seems to be the most equitable outcome given the facts here." The correspondence also reflects that Metro had "frozen

all permits on [Plaintiff's] property," making it impossible to meet the two-year deadline to pull permits for the Project. A copy of this correspondence is attached as **Exhibit C**.

33. On or around April 19, 2023, Metro Nashville's Department of Law and Zoning Administrator sent a letter to Plaintiff (the "**Letter**") stating that the Permit Lock was "likely to persist for an indefinite time."

34. The Letter states, in relevant part, that:

> [D]ue to Metro's not issuing permits (with non-issuance of permits likely to persist for an indefinite time) for construction activities for certain real property parcels in the East Bank area, including the Property, due to no fault or actions of Owner, Metro has the authority to, and does hereby, extend the Metro Code Section 17.40.250 two (2) year time limitation to obtain permits subsequent to the effective date of the Order for a period of time equal to two (2) years from the date in the future that Metro makes construction permits once again obtainable for the Property (the "Permit Availability Date").

A copy of the Letter is attached as **Exhibit D**.

35. The Letter constitutes Metro Nashville's admission that the Permit Lock was "likely to persist for an indefinite time," and that the Permit Lock constituted an indefinite continuing violation of Plaintiff's right to develop the Project on its Property as an as-of-right development.

36. Per Metro Code § 17.40.250, without a formal moratorium, Metro Nashville was required to allow Plaintiff to obtain all permits necessary to satisfy its BZA requirements on or before May 21, 2023.

37. Due to the investment opportunity this Project provided and the immense time and material costs that were funneled into developing the Project, and in reliance on its discussions and administrative progress with Metro Nashville, Plaintiff had no practical legal or business path but to wait for Metro Nashville to lift the Permit Lock.

38. Metro had the exclusive ability to lift the Permit Lock it imposed. Metro chose to leave the Permit Lock in effect every day from November 23, 2021 through June 4, 2026.

39. On June 4, 2026, Metro Nashville's counsel notified Plaintiff's counsel by email that the Permit Lock on Plaintiff's Property had been lifted. Specifically, Metro's counsel wrote that "all of the flags have been lifted from the properties that had been identified as being within the potential corridor for the spine road in the East Bank Development area" and stated that Plaintiff was "free to submit whatever development application(s) they wish to submit." A copy of the June 4, 2026 email is attached as **Exhibit E**.

40. The Permit Lock was in effect from approximately November 23, 2021 through June 4, 2026 during which Metro Nashville refused to process Plaintiff's permit applications for an as-of-right project.

41. Moreover, the QOF Rules require that investments in Qualified Opportunity Zones deploy working capital assets (the invested funds) to commence construction and complete the Project within a limited amount of time to qualify for tax benefits under the QOF Rules. Metro Nashville's imposition of the indefinite Permit Lock on the Project prevented Plaintiff from being able to determine if it could meet the timelines required by the QOF Rules, resulting in the loss of certainty to Plaintiff's investors of material tax benefits, exposure to additional costs and penalties, and AB PR QOF IV L.P. and AB PR Parallel QOF IV L.P. decertifying themselves as "Qualified Opportunity Funds" within the meaning of Treasury Regulations Section 1.1400Z2(d)-1(a)(3) on or about September 13, 2023.

42. Metro Nashville made no effort to minimize the damages it caused Plaintiff. The self-serving Permit Lock, which benefited Metro Nashville alone, evidenced Metro Nashville's indifferent attitude and disrespect of Plaintiff's property rights.

43. Plaintiff's grading permit expired on January 23, 2024, because of Metro Nashville's Permit Lock. The grading permit required that grading must be completed within a year, but Plaintiff was unable to begin grading work without assurances from Metro Nashville that it would lift the Permit Lock and allow Plaintiff to develop the Project.

44. As a direct consequence of Metro Nashville's Permit Lock, which was in effect for over four and a half years, the Project as designed is no longer feasible. The lifting of the Permit Lock on June 4, 2026, did not cure or end Plaintiff's damages. Plaintiff continues to suffer substantial, ongoing, and permanent economic damages caused by the Permit Lock, including the permanent loss of the Project's feasibility, sunk pre-development costs, the termination of the GMP Construction Contract and Construction Loan, the decertification of AB PR QOZV IV L.P. and AB PR Parallel QOF IV L.P. as Qualified Opportunity Funds and resulting loss of QOF tax benefits, and intervening adverse changes in the real estate development environment—including construction costs, interest rates, and other factors—that occurred during and because of the delay. These damages persist and continue to accrue after June 4, 2026, notwithstanding that the Permit Lock has been lifted.

45. Metro Nashville has an obligation to issue proper and timely permits and, by not doing so in this instance, Metro Nashville abused its power by encroaching upon private interests without a reasonable public purpose. Metro Nashville's illegal and indefinite de facto moratorium on the issuance of permits constitutes an illegal regulatory taking of Plaintiff's Property without its consent, and without due process of law or compensation, in violation of the Fifth Amendment of the United States Constitution and Article I, § 21 of the Tennessee Constitution.

46. Metro Nashville's absolute and continuing control over Plaintiff's Property, via the permit system, constituted a "per se" taking because the Permit Lock wholly divested Plaintiff of its rights in the Property from November 23, 2021 through June 4, 2026.

47. Metro Nashville's Permit Lock amounted to a total regulatory taking because it deprived Plaintiff of all economically beneficial or productive use of the Property for over four and a half years.

48. Metro Nashville's Permit Lock amounted to a partial regulatory taking because it interfered with Plaintiff's reasonable investment-backed expectations, its nature amounted to a physical taking, and it caused a diminution in value of the Property.

49. Metro Nashville exceeded its authority and acted in an extra-legal manner by implementing the Permit Lock, effectuating a pre-legislative moratorium, without due process, legislation, or accountability.

50. Plaintiff demands a trial by jury on all matters.

**BASIS FOR CLAIMS**

51. Plaintiff brings its takings claims under the Fifth Amendment of the United States Constitution, article I, section 21 of the Tennessee Constitution, and Tennessee Code Ann. § 29-16-123.

52. Article I, section 21 of the Tennessee Constitution recognizes federal takings jurisprudence. The Tennessee Constitution provides: "That no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives, or without just compensation being made therefor." Tenn. Const. art. I, § 21.

53. The Tennessee Supreme Court has held that article I, section 21 of the Tennessee Constitution encompasses regulatory takings to the same extent as the Takings Clause of the Fifth

Amendment to the United States Constitution. *Phillips v. Montgomery Cnty*., 442 S.W.3d 233, 244 (Tenn. 2014).

54. Plaintiff's unlawful takings claims may also be brought directly under the Takings Clause of the Fifth Amendment of the United States Constitution. "The just compensation requirement of the Takings Clause is 'self-executing' and '[s]tatutory recognition [is] not necessary' for takings claims because they are grounded in the Constitution itself.'" *DeVillier v. Texas*, 601 U.S. ---, 144 S.Ct. 938, 943 (2024) (alterations in original) (citing *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987)).

55. Alternatively, 42 U.S.C. § 1983 provides Plaintiff with a vehicle to assert constitutional violations.

56. The Supreme Court has held that property owners who have suffered a violation of their Fifth Amendment rights when the government takes their property without just compensation may bring a claim in federal court under § 1983, without first having to exhaust the state-litigation requirement. *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 185 (2019).

57. The Civil Rights Act of 1871 guarantees "a federal forum for claims of unconstitutional treatment at the hands of state officials," and the settled rule is that "exhaustion of state remedies 'is not a prerequisite to an action under [42 U.S.C.] § 1983.'" *Heck v. Humphrey*, 512 U.S. 477, 480 (1994) (quoting *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 501 (1982)).

58. Plaintiff's claims are timely. Under *Knox Cnty. v. Moncier*, 455 S.W.2d 153, 156 (Tenn. 1970) and *B & B Enterprises of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 846 (Tenn. 2010), a regulatory taking claim accrues only when the property owner knows, or reasonably should know, that the government's action has caused a permanent rather than temporary deprivation of property rights. Here, accrual was deferred—and, alternatively, the

limitations period was equitably tolled—throughout the entire period that the Permit Lock remained in place and indefinite, from November 23, 2021 through June 4, 2026. Metro Nashville's own contemporaneous written admission in its April 19, 2023 Letter that non-issuance of permits was "likely to persist for an indefinite time" established, by Metro Nashville's own characterization, that the injury was not permanent while the Permit Lock remained indefinite. Plaintiff therefore could not reasonably determine that a permanent taking had occurred during that period. June 4, 2026, when Metro Nashville lifted the Permit Lock, is the operative accrual/end date because the lifting made the interference final as to its duration or, alternatively, confirmed Metro Nashville's abandonment of the prohibition.

59. Alternatively, the Permit Lock constituted a continuing violation and a rolling accrual of Plaintiff's claims. The Permit Lock was an ongoing, extra-legal administrative action, renewed each day by Metro Nashville's continued refusal to process or issue permits, and each day it remained in place—from November 23, 2021 through June 4, 2026—constituted a new and separate injury giving rise to its own one-year limitations period.

60. Metro Nashville should also be equitably estopped from invoking a limitations bar based on Plaintiff's failure to recognize a "permanent" taking. A government that imposes an admittedly extra-legal, indefinite prohibition, while representing that it is likely to persist for an indefinite time, cannot fairly invoke a limitations defense premised on Plaintiff's failure to treat the interference as permanent on the date of imposition. Metro Nashville's own misconduct and uncertainty support equitable tolling and preclude reliance on its extra-legal conduct under principles of equitable estoppel and unclean hands.

61. The Permit Lock constituted a continuing violation under the Sixth Circuit's three-part standard: a continuing violation exists where (1) the defendant engages in continuing wrongful

conduct; (2) injury to the plaintiff accrues continuously; and (3) had the defendant at any time ceased its wrongful conduct, further injury would have been avoided. *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009). Metro Nashville's ongoing refusal to process or issue permits during the Permit Lock—from November 23, 2021 through June 4, 2026—satisfies each element because Metro Nashville continuously maintained the wrongful Permit Lock, Plaintiff's injury accrued each day the Property remained unavailable for the Project, and any further injury would have been avoided had Metro Nashville lifted the Permit Lock. The continuing-violation doctrine applies to violations of the Takings Clause. *Guba v. Huron Cty.*, 600 F. App'x 374, 380 (6th Cir. 2015). It also applies to violations of the Due Process Clause. *Id.*; *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997). When the doctrine applies, it tolls the limitations period for the entire duration of the government's malfeasance. *McNamara v. City of Rittman*, 473 F.3d 633, 639 (6th Cir. 2007).

62. In the alternative, even if Metro Nashville's permitting delay was initially permissible, the regulatory-taking claim accrued only when the delay became unreasonable or extraordinary, not upon the first preliminary act in the decision-making process. *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 497 (2009). The delay became—and remained—unreasonable and extraordinary throughout the duration of the Permit Lock because Metro Nashville continued to refuse to process Plaintiff's permit applications and continued to impose new conditions for release of the Permit Lock. The extraordinary delay continued until the Permit Lock was lifted on June 4, 2026. The accrual date under this theory requires a fact-intensive examination. Under this theory, Plaintiff's claim did not accrue until June 4, 2026, when Metro Nashville removed the restriction.

63. Further, it would be inequitable to penalize Plaintiff for cooperating with Metro Nashville and attempting to resolve the Permit Lock administratively instead of immediately filing

suit. Enforcing takings claims with an eye toward fairness is incompatible with imposing a limitations bar on Plaintiff who honored the government's requests for patience while the government continued working on the issue. *Barlow & Haun, Inc. v. United States*, 87 Fed. Cl. 428, 438 (2009). Metro Nashville should not benefit from the uncertainty and delay it created while Plaintiff incurred substantial costs and continued to seek an administrative resolution.

64. Plaintiff alleges that (1) its primary position, as pleaded above, is that its claims accrued on June 4, 2026, when Metro Nashville lifted the Permit Lock, and therefore the claims are timely; (2) in the alternative, if the Court determines that June 4, 2026 does not mark the accrual date or the start of the limitations period, then the limitations period began no earlier than April 19, 2023, when Metro Nashville issued the Letter stating that the non-issuance of permits was "likely to persist for an indefinite time," because that Letter was the first point at which Plaintiff could reasonably have been on notice of a potentially permanent, rather than temporary, deprivation of its rights to develop the Project on the Property, and Plaintiff's claims filed in this action are timely measured from that date; and (3) in the further alternative, if the Court determines that the limitations period began to run on November 23, 2021, when the lock was imposed, then the limitations period was equitably tolled based on the continuing violation, Metro Nashville's representations that the Permit Lock was likely to persist for an indefinite time, Metro Nashville's March 28, 2023 admission that it caused the delay, and Plaintiff's good-faith cooperation and attempts to resolve the matter administratively, such that Plaintiff's claims remain timely.

## COUNT I
## DECLARATORY JUDGMENT
*TENN. CODE ANN. § 29-14-103*

65. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-55 as if fully set forth herein and further states:

66. There is a genuine and substantial controversy that exists between the parties with respect to Metro Nashville's refusal to issue permits during the Permit Lock period. Plaintiff has suffered actual present harm, and a declaratory judgment is substantially likely to redress Plaintiff's actual injuries.

67. Plaintiff seeks a determination from this Court that (1) Plaintiff had (and still has) vested rights in the Property, (2) Metro Nashville's Permit Lock was illegal, and (3) Plaintiff is entitled to just compensation resulting from Metro Nashville's violations of Plaintiff's constitutional rights.

68. In good faith, Plaintiff reasonably relied on Metro Nashville's issuance of permits and approvals to purchase the Property, incur substantial pre-development costs, close on the Construction Loan, and enter into the GMP Construction Contract for the development of a large residential structure and parking facility on the Property.

69. Plaintiff expended substantial financial resources to commence sitework immediately after demolition.

70. Metro Nashville's indefinite Permit Lock effectively prevented Plaintiff from developing the Property for over four and a half years.

71. By ignoring Metro Code § 17.40.250 and maintaining the Permit Lock from November 23, 2021 through June 4, 2026, Metro Nashville exceeded its authority to interfere with Plaintiff's property rights.

**COUNT II**
**PER SE TAKING**

*U.S. CONST. amend V; Tenn. Const. art. I, § 21; T.C.A. 29-16-123; 42 U.S.C. § 1983*

72. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-72 as if fully set forth herein and further states:

73. Plaintiff has a valuable and vested interest in the Property.

74. By imposing and maintaining the Permit Lock, and thereby wholly preventing Plaintiff from exploiting the value of its Property from November 23, 2021 through June 4, 2026, Metro Nashville expropriated Plaintiff's Property and effected a per se physical taking of the Property. A per se (categorical) physical taking arises when the government expropriates private property or requires the owner to suffer a physical invasion. Such an expropriation is a taking whether it is permanent or temporary.

75. The temporary duration of Metro Nashville's expropriation bears only on the amount of just compensation owed, not on whether a taking occurred. See *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021).

76. Metro Nashville's lifting of the Permit Lock on June 4, 2026 does not defeat the taking. A temporary deprivation of all use and occupancy of the Property is not different in kind from a permanent one and requires just compensation for the period of the deprivation. See *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987).

77. Metro Nashville's exclusion of Plaintiff from all use and occupancy of the Property amounted to a physical taking and expropriation, or, at a minimum, present fact questions for the trier of fact.

78. Since Metro Nashville expropriated the Property and all rights related thereto, Plaintiff is entitled to just compensation.

## COUNT III
## TOTAL REGULATORY TAKING

*U.S. CONST. amend V; Tenn. Const. art. I, § 21; T.C.A. 29-16-123; 42 U.S.C. § 1983*

79. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-78 as if fully set forth herein and further states:

80. Metro Nashville's placement of the Permit Lock was a regulatory action that deprived Plaintiff of all economically beneficial or productive use of the Property from November 23, 2021 through June 4, 2026. Metro Nashville's Permit Lock forced Plaintiff to leave its property economically idle. Plaintiff has thus suffered a taking. The economic harm caused by the deprivation was not restored when the Permit Lock was lifted on June 4, 2026; it continues to damage Plaintiff and to accrue through ongoing and consequential losses, including the permanent loss of the Project's feasibility.

81. Metro Nashville has chosen to not reduce Plaintiff's damages.

82. Metro Nashville, via its Permit Lock, directly caused extraordinary damages to Plaintiff; Plaintiff is entitled to just compensation.

## COUNT IV
## NON-CATEGORICAL REGULATORY TAKING

*U.S. CONST. amend V; Tenn. Const. art. I, § 21; T.C.A. 29-16-12; 42 U.S.C. § 1983*

83. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-82 as if fully set forth herein and further states:

84. In identifying a regulatory taking, the court must make a case-by-case determination by evaluating the facts in light of the following factors:

(a) The owner's reasonable investment-backed expectations;

(b) The nature of the government actions; and

(c) The degree of diminution in property value.

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978).

85. Plaintiff's investment-backed expectations for the Property and Project were both subjectively held and objectively reasonable.

86. The Permit Lock was a physical invasion of the Property; it eliminated Plaintiff's ability to develop the Property in any way during the period it was in effect. Its effects are functionally comparable to direct government expropriation and ouster.

87. Metro Nashville's intentional frustration of the Project's commencement of construction on the Property to enable potential development of the Vision Plan did not substantially advance legitimate governmental interests. Not only is the Vision Plan a mere vision at this point, but also, alternative viable options exist for the development of the East Bank that would avoid interference with Plaintiff's rights.

88. Plaintiff is not simply experiencing a diminution in value of its Property/Project, the Permit Lock rendered the Property less valuable and the Project no longer feasible. Metro Nashville's actions, causing extreme delays during a time of drastic economic changes, rendered the Project no longer feasible, causing Plaintiff permanent and substantial economic damages.

89. The Permit Lock caused a permanent diminution in value of the Property/Project because it prohibited the Property's use for any commercial purpose while the Permit Lock was in effect, rendering the Property less valuable and the Project unfeasible. The resulting diminution in value and loss of feasibility persist after the Permit Lock was lifted on June 4, 2026, and continue to cause Plaintiff ongoing economic harm.

90. Due to the substantial damages that Plaintiff has incurred, even though Metro Nashville has now lifted the Permit Lock, Plaintiff remains unable to commence the Project as planned and may not be able to develop any alternative project. The resulting loss of the Project's feasibility is permanent and continues after the Permit Lock was lifted. Since Metro Nashville's placement of the Permit Lock, Plaintiff has suffered the termination of both the GMP Construction Contract and the Construction Loan at material costs to Plaintiff; together with material changes

in the real estate development economic environment (construction costs, interest rates, and other factors), those consequences made the Project impossible to develop as planned and continue to cause ongoing economic damages.

91. Metro Nashville has not reduced Plaintiff's damages or offered just compensation for its regulatory taking.

92. Plaintiff is entitled to just compensation for Metro Nashville's taking.

**COUNT V**
**PROCEDURAL DUE PROCESS VIOLATION**
*U.S. CONST. amend XIV; 42 U.S.C. § 1983*

93. Plaintiff realleges and reaffirms the allegations of Paragraphs 1-92 as if fully set forth herein and further states:

94. Plaintiff has a constitutionally protected interest in the Property. Plaintiff has a vested property right by its ownership of the Property.

95. Moreover, Plaintiff has obtained a vested property right for the intended use of the Property through estoppel principles. Metro Nashville made specific inducements and assurances, including approving Plaintiff's requested variance, issuing demolition and grading permits, and assuring Plaintiff that it would soon make the decisions necessary to allow Plaintiff to move forward with the Project. Plaintiff significantly relied on those assurances, demonstrated by its large investment in the Project and the inequitable burden on Plaintiff by Metro Nashville placing and maintaining the Permit Lock.

96. Metro Nashville deprived Plaintiff of its protected property interest. Plaintiff was unable to develop or use the Property during the period of the Permit Lock, and can no longer develop or use the Property as intended due to changed economic circumstances, including but not limited to, increased interest rates and construction costs. The Permit Lock also caused Plaintiff to

incur the loss of substantial "sunk funds" that had been invested in loan acquisition and closing expenses, architectural and engineering costs, and other Project specific costs.

97. Metro Nashville's procedures were constitutionally inadequate or unfair, and deprived Plaintiff of due process. Metro Nashville did not give Plaintiff notice that it was taking the Property or an opportunity to be heard.

98. Tennessee law provides a procedure for Metro Nashville to seek to appropriate privately held land, including the Property. Tenn. Code Ann. §§ 29-16-104, 29-17-104, 29-17-201, 29-17-301, 29-17-302. Metro Nashville took the Property outside of the legally permitted procedures by placing and maintaining the Permit Lock from November 23, 2021 through June 4, 2026.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, AB PR QOZB IV PROPERTY, LLC, respectfully prays the following:

A. This Court finds that a genuine controversy exists between the parties with respect to the enforcement and interpretation of Tennessee statutory law governing the authority of Metro Nashville to enforce an indefinite permit lock when an approved variance is pending;

B. This Court issue a declaratory judgment, pursuant to Tenn. Code Ann. § 29-14-103, that:

1. Plaintiff has a vested right in the Property; and
2. Metro Nashville's refusal to issue permits is outside Metro Nashville's statutory power;

C. Empanel a jury of twelve (12) persons to try the issues of full compensation for the taking of Plaintiff's property, including damages incurred during the Permit Lock period and

continuing and ongoing consequential damages that persist after June 4, 2026 as a result of the Permit Lock, according to the Complaint and the United States Constitution, and render its verdict of full compensation together with punitive damages, statutory interest, attorneys' fees, experts' fees, and costs for the prosecution of this matter according to case and statutory law;

D. This Court find that Metro Nashville willfully and knowingly violated Plaintiff's rights provided by the Fifth Amendment of the United States Constitution and Tennessee Constitution article I, section 21;

E. Costs of this cause be taxed to Metro Nashville; and

F. Grant such other and further relief to the Plaintiff as the Court deems necessary and appropriate in this cause.

Dated: September 21, 2026.

Respectfully submitted,

NELSON MULLINS RILEY
& SCARBROUGH, LLP

*/s/ S. Wade Malone*

S. Wade Malone, GA Bar No. 468015
Mackenzie Keffalos, BPR No. 38355
Laurence M. Papel, BPR No. 007185
Wade Malone (PHV Applicant)
1222 Demonbreun Street, Suite 1700
Nashville, Tennessee 37203
(615) 664-5333
Wade.malone@nelsonmullins.com
Mackenzie.keffalos@nelsonmullins.com
Larry.papel@nelsonmullins.com

*Attorneys for Plaintiff*
*AB PR QOZB IV Property, LLC*

# EXHIBIT A

**BEFORE THE METROPOLITAN BOARD OF ZONING APPEALS**

RE: Andrew Wolthers
51 OLDHAM ST
Appeal Case 2021-073

Map Parcel: 08214004300
Zoning Classification: MUI-A
Council District: 5

**ORDER**

This matter came to be heard in public hearing on 5/20/2021, before the Metropolitan Board of Zoning Appeals, upon application for variances from street level parking deck having office or commercial uses and raised foundation requirements. The appellant is constructing a multi-family apartment building.

Based upon the entire record as recorded on the video recording and contained in the file, from all of which the Board finds that:

(1) Proper legal and written notice of the public hearing had been complied with as set forth in Section 17.40.720 of the Metropolitan Code.

(2) The appellant sought this permit under Section 17.40.180 B of the Metropolitan Code.

(3) The appellant HAS satisfied all of the standards for a variance under Section 17.40.370 of the Metropolitan Code due to the floodplain overlay.

It is, therefore, ORDERED by the Metropolitan Board of Zoning Appeals that the appellant's request shall be GRANTED, subject to the following conditions: NONE.

UPON MOTION BY: Logan Newton
Seconded By: Ashonti Davis

Ayes: Christina Karpynec, Ross Pepper, David Taylor, Joseph Cole, Tom Lawless
Nays:
Abstaining:
Absent:

ENTERED THIS 21st DAY OF May, 2021

METROPOLITAN BOARD OF ZONING APPEALS

[signature]
Chair

[signature]
Secretary

EXHIBIT
57
10-7-25 SW

# EXHIBIT B

Message

**From:** Brewington, David (WS) [David.Brewington@nashville.gov]
**Sent:** 2/8/2022 3:21:39 PM
**To:** Matthew Beck [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=456d6470317a4e54a63041ff0577f7e9-Mathew Beck]
**CC:** Balthrop, Hal (WS) [hal.balthrop@nashville.gov]
**Subject:** RE: 51 Oldham Capacity Fees

Matthew,

I've adjusted the expiration dates in the system to show 2/25/2023. Below are the links to ePermits showing the new dates.

https://epermits.nashville.gov/#/permit/3931257?searchCode=PRMT&page=1&searchText=2021011443&searchType=permit&orderBy=fullAddress ASC,permitNumber ASC

https://epermits.nashville.gov/#/permit/3931229?searchCode=PRMT&page=1&searchText=2021011443&searchType=permit&orderBy=fullAddress ASC,permitNumber ASC

---

**From:** Matthew Beck <MBeck@liverangewater.com>
**Sent:** Tuesday, February 8, 2022 1:49 PM
**To:** Brewington, David (WS) <David.Brewington@nashville.gov>
**Subject:** RE: 51 Oldham Capacity Fees

**Attention**: This email originated from a source external to Metro Government. Please exercise caution when opening any attachments or links from external sources.

Hi David,

Thanks for your clarification on this. We spoke with Tom Cross and he indicated that Metro is open to extending our permits – continuing to guarantee our existing capacity and fee schedule – without having to make our next scheduled payment on 2/25 – can you please confirm that that's the case and also let us know when our next payment will be required.

Thanks,
Matthew

**MATTHEW BECK**
*Manager, Development*
mbeck@LiveRangeWater.com
5605 Glenridge Dr. NE Suite 775, Atlanta, GA 30342
C 202.288.8022

---

**From:** Brewington, David (WS) <David.Brewington@nashville.gov>
**Sent:** Friday, January 21, 2022 10:03 AM
**To:** Matthew Beck <MBeck@liverangewater.com>
**Subject:** Re: 51 Oldham Capacity Fees

EXHIBIT 68
10-7-25

Matthew,

Most likely but I cannot guarantee any statements of capacity until the study is reviewed by our modeling group and completed, Studies can take up to 15 working days to complete.

**From:** Matthew Beck <MBeck@liverangewater.com>
**Sent:** Friday, January 21, 2022 8:49 AM
**To:** Brewington, David (WS) <David.Brewington@nashville.gov>
**Subject:** RE: 51 Oldham Capacity Fees

**Attention**: This email originated from a source external to Metro Government. Please exercise caution when opening any attachments or links from external sources.

Thanks, David.

If we resubmit now, would we still be guaranteed capacity under the current agreement until 2/25? If so, how long will a new study take to complete?

**MATTHEW BECK**
*Manager, Development*
mbeck@LiveRangeWater.com
5605 Glenridge Dr. NE Suite 775, Atlanta, GA 30342
C 202.288.8022

**From:** Brewington, David (WS) <David.Brewington@nashville.gov>
**Sent:** Thursday, January 20, 2022 11:05 AM
**To:** Matthew Beck <MBeck@liverangewater.com>
**Subject:** Re: 51 Oldham Capacity Fees

Matthew,

If you do not meet the next payment date, the permit will expire.

You will need to resubmit for Capacity. At that point, capacity is not reserved at the site until a study is done and the next minimum payment is secured. The payment schedule will change as well.

You will keep what has been paid and it will be given as credit when the new submittal is made.

To clarify: If the payment date of 2/25/2022 is not made, the permits expire. You will need to resubmit for capacity, since the statements of capacity have expired. At that point, no capacity is guaranteed until an official new study has been completed. A new payment schedule will be made, but credit will be given for what has been paid.

**From:** Matthew Beck <MBeck@liverangewater.com>
**Sent:** Thursday, January 20, 2022 10:01 AM
**To:** Brewington, David (WS) <David.Brewington@nashville.gov>
**Subject:** 51 Oldham Capacity Fees

**Attention**: This email originated from a source external to Metro Government. Please exercise caution when opening any attachments or links from external sources.

Hi David,

I know Andrew Wolthers reached out to you on this, but I wanted to follow up to make sure I understand the process as well as address a couple of questions we have before we proceed with adjusting the schedule.

We have paid the 1 Year (30%) fee for both water and sewer, and, given the delay in the project, are proposing to push the 2 Year (55%) payment out to 2/25/2023.

I want to confirm that pushing this payment out will have no impact on our project, that we will continue to be guaranteed the same water and sewer capacity that appears in the attached permit, that the payment schedule will remain as it is in the permit, and that the Year 1 payment that has already been processed will still be applicable – can you please confirm?

We appreciate your help on this.

Best regards,
Matthew


**MATTHEW BECK**
*Manager, Development*
mbeck@LiveRangeWater.com
5605 Glenridge Dr. NE Suite 775, Atlanta, GA 30342
C 202.288.8022


RANGEWATER
Real Estate


*Please join RangeWater and consider our environment before printing this e-mail.*
**********************************************************************

< CONFIDENTIALITY NOTICE >
The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers.

# EXHIBIT C

Message

**From:** Larry Papel [Larry.Papel@nelsonmullins.com]
**Sent:** 3/28/2023 7:25:36 PM
**To:** Hargis, Joey (Codes) [joey.hargis@nashville.gov]
**CC:** Ladd, Tara (Legal) [tara.ladd@nashville.gov]
**Subject:** RE: RangeWater: BZA Meeting on 4/20/51 Oldham Street

Joey,

Let's discuss.

One fundamental question is if you/Codes have/has the authority to extend the two-year deadlines without action of the BZA.

If so, great, and we can discuss the reasons and relevant time-lines.

One issue is that we don't know when Metro will terminate the current "no permits" state of matters.

You available in the morning? I'm on Mountain time this week (one hour earlier than CDT) and available early morning.

The "no permit" conditions commenced about March 2021. But I'll have to check that.

Larry


NELSON MULLINS

LAURENCE M. PAPEL PARTNER
larry.papel@nelsonmullins.com
ONE NASHVILLE | SUITE 1100
150 FOURTH AVENUE NORTH | NASHVILLE, TN 37219
T 615.664.5353 M 615.491.5126


EXHIBIT
58
10-7-25 SW

**From:** Hargis, Joey (Codes) <joey.hargis@nashville.gov>
**Sent:** Tuesday, March 28, 2023 2:14 PM
**To:** Larry Papel <Larry.Papel@nelsonmullins.com>
**Cc:** Ladd, Tara (Legal) <Tara.Ladd@nashville.gov>
**Subject:** RE: RangeWater: BZA Meeting on 4/20/51 Oldham Street

Honestly I was not aware that Metro itself is the cause for the delay in commencing. Seeing as we( Metro) are the reasoning for the delay, I will pause the time during the time that Metro held up the permits and not count that time against the 2 year deadline.

This seems to be the most equitable outcome given the facts here. Please let me know the timeline of events and the pertinent facts involved here and I'll review and likely withdraw the appearance to the BZA.


Joey Hargis
Metropolitan Zoning Administrator
Department of Codes and Building Safety
Metro Office Building
P. O. Box 196350
800 President Ronald Reagan Way 1st Floor
Nashville, Tennessee 37210


**From:** Larry Papel <Larry.Papel@nelsonmullins.com>
**Sent:** Tuesday, March 28, 2023 1:14 PM
**To:** Hargis, Joey (Codes) <joey.hargis@nashville.gov>
**Cc:** Ladd, Tara (Legal) <Tara.Ladd@nashville.gov>
**Subject:** RangeWater: BZA Meeting on 4/20/51 Oldham Street


**Attention**: This email originated from a source external to Metro Government. Please exercise caution when opening any attachments or links from external sources.


Joey,

Can we schedule a call early next week to talk about RangeWater's scheduled appearance before the BZA to extend the parking and elevation relief granted in 2021?

See the article below for some color on this. I know you've communicated with Tara on this.

I think you know that Metro has frozen all permits on RangeWater's property, and many others around it, making it impossible to meet the 2 year deadline to pull permits for the RangeWater project.

Let us know what days/times next week work and we'll circulate an invitation.

Thanks,

Larry


LAURENCE M. PAPEL PARTNER
larry.papel@nelsonmullins.com
ONE NASHVILLE | SUITE 1100
150 FOURTH AVENUE NORTH | NASHVILLE, TN 37219
T 615.664.5353 M 615.491.5126


DEVELOPMENT

# Real Estate Notes: East Bank project progresses

## *Also: Permit sought to update Gulch building for retailer; MDHA vote deferred on Midtown project*

- WILLIAM WILLIAMS

- MAR 24, 2023

Atlanta-based development company Rangewater Real Estate is planning to go before the Metro Board of Zoning Appeals to request variances related to parking and elevation.

An April 20 hearing date is scheduled.

The effort comes about 1.5 years after Rangewater paid $12.5 million for the 3.77-acre industrial site on the East Bank and on which it plans the apartment building. The address is **51 Oldham St.**

A document submitted to Metro notes Nashville's Catalyst Design Group is handling engineering and land-planning duties.

As the *Post* reported in September 2021, Rangewater was planning a 353-unit apartment building, with a groundbreaking slated for that month, according to a release.

Rangewater (stylized as "RangeWater") once owned the residential units in mixed-used Gulch building Velocity and developed a North Gulch site with The Gossett

The East Bank property sits across Oldham Street from the warehouse home to craft beer business Barrique Brewing (and Little Harpeth Brewing prior to that) and one block south of the Topgolf facility. Nearby is the Cumberland River.

Read more **here**.

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

# EXHIBIT D

JOHN COOPER
MAYOR

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

DEPARTMENT OF LAW

April 19, 2023

**Email and Regular U.S. Mail**

Laurence M. Papel
Nelson Mullins Riley & Scarborough LLP
One Nashville/Suite 1100
150 Fourth Avenue North
Nashville, TN 37219
Email: larry.papel@nelsonmullins.com

RE: BZA Order (dated May 21, 2021) (the "**Order**") in Appeal Case 2021-073 regarding Map/Parcel # 08214004300 /51 Oldham Street (the "**Property**) owned by AB PR QOZB IV Property, LLC ("**Owner**")

Dear Larry:

On behalf of the Metropolitan Government of Nashville and Davidson County, Tennessee ("**Metro**") and the Board of Zoning Appeals ("**BZA**"), this letter confirms that, due to Metro's not issuing permits (with non-issuance of permits likely to persist for an indefinite time) for construction activities for certain real property parcels in the East Bank area, including the Property, due to no fault or actions of Owner, Metro has the authority to, and does hereby, extend the Metro Code Section 17.40.250 two (2) year time limitation to obtain permits subsequent to the effective date of the Order for a period of time equal to two (2) years from the date in the future that Metro makes constructions permits once again obtainable for the Property (the "**Permit Availability Date**").

Metro will notify Owner and counsel of the Permit Availability Date by email and regular U.S. Mail, at the addresses shown below, within ten (10) business days of the date that permits become available.

Very truly yours,

*Tara Ladd*

Tara Ladd
Metropolitan Department of Law

*Joel K Herring*

Joey Hargis
Metropolitan Zoning Administrator

{N0532635.1}

EXHIBIT
59
10-7-25 SW

Notice Addresses:

Laurence M. Papel
Nelson Mullins Riley & Scarborough LLP
One Nashville/Suite 1100
150 Fourth Avenue North
Nashville, TN 37219
Email: larry.papel@nelsonmullins.com

Palmer McArthur
RangeWater Development
*Managing Director, Development – Carolinas/Tennessee*
5605 Glenridge Dr. NE Ste 800
Atlanta, GA 30342
pmcarthur@liverangewater.com

# EXHIBIT E

**Mackenzie Keffalos**

---

**From:** Fox, Brook (Legal) <Brook.Fox@nashville.gov>
**Sent:** Thursday, June 4, 2026 3:11 PM
**To:** Kate Skagerberg; Mackenzie Keffalos
**Cc:** Puckett, Benjamin (Legal); Vizcarrondo, Peter (Legal); Bussell, Allison (Legal)
**Subject:** Rangewater - flags are all now lifted

**External Source/Sender notice**
Use caution responding or clicking links/attachments.
Report Suspicious

Kate,
We are writing to alert you to the fact that all of the flags have been lifted from the properties that had been identified as being within the potential corridor for the spine road in the East Bank Development area. So, you may emphasize to your clients that they are free to submit whatever development application(s) they wish to submit. Any such application(s) will be reviewed by the relevant Metro agencies and personnel in the ordinary course of business. I hope this email finds you well.
Brook

J. Brooks Fox
Attorney for the Metropolitan Government
P. O. Box 196300
Nashville, TN 37219
615-862-6375

This electronic message transmission contains information from the Department of Law of the Metropolitan Government of Nashville and Davidson County, Tennessee, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information may be prohibited.